2016 WL 3769477
United States Court of Appeals,
Eighth Circuit.

United States of America, Plaintiff–Appellee

v.

Marcus Lamont Eason, Defendant–Appellant

No. 15-1254
|
Submitted: December 15, 2015
|
Filed: July 14, 2016

Appeal from United States District Court for the Eastern District of Arkansas—Little Rock

Before MURPHY, BENTON, and KELLY, Circuit Judges.

**Opinion**

KELLY, Circuit Judge.

 **\*1** After a jury trial, Marcus Lamont Eason was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1) (Count 1), and of being a felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1), and 3147(1) (Count 2). Eason appeals, challenging the district court's exclusion of evidence he attempted to introduce at trial, the sufficiency of the evidence for his conviction on Count 2, and the application of the Armed Career Criminal Act (ACCA) at sentencing. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm in part and reverse in part.

### I. Background

On June 16, 2012, in North Little Rock, Arkansas, Eason was involved in a domestic incident with his then-girlfriend, Sheila Noble. Noble's mother reported the disturbance to the police, and then called again to report that Eason was "shooting up" behind her house. Radio dispatch gave officers a description of the person suspected of firing the shots, and relayed that the suspect's name was Marcus Eason. Police Sergeant Terry Kuykendall heard the dispatch and soon spotted Eason walking and carrying a black t-shirt in his left

hand. According to Kuykendall, it looked like Eason had something concealed in the shirt. Kuykendall stated he had no difficulty identifying Eason from 50–60 yards away. While making a U-turn, Kuykendall saw Eason drop an item to the ground.

Kuykendall stopped Eason, patted him down, and waited for backup. After backup arrived, Kuykendall searched the area where he believed Eason had thrown something and found a .45-caliber pistol lying on the ground in the path where Eason had been walking. Later, Kuykendall also found two .45-caliber shell casings in the area of the reported shooting, which he deemed to be from a gun like the one he had recovered. Eason was indicted on one count of possession of a firearm as a felon, was arraigned in federal court, and on December 18, 2012, was released on conditions to the supervision of the United States Probation Office pending trial.

On April 9, 2013, while on pretrial release, Eason was involved in an incident at the residence of Hiawatha Williams, also in North Little Rock. At that time, Eason was engaged to Williams's daughter, Erica Davis, and he and Davis had a dispute. When Williams saw that Eason had a firearm, he ran next door and borrowed a .380 pistol. Williams returned to his home and fired a warning shot, which hit the ceiling immediately above him on the front porch. According to Williams, Eason then left the residence. As Williams returned to his bedroom, he heard a shot fired. Although he did not see the shooter, Williams believed it was Eason. Later, during the investigation, Detective Gibbons of the North Little Rock Police found a 9-millimeter bullet in Williams's bedroom closet and a spent shell casing nearby. A superseding indictment was filed, adding Count 2: possession of ammunition as a felon. On April 16, 2013, Eason was ordered to be detained pending trial.

 **\*2** The jury returned guilty verdicts on both counts – Count 1, for possession of the .45-caliber pistol that Officer Kuykendall retrieved, and Count 2, for possession of the 9-millimeter ammunition found in Williams's closet. At sentencing, the court determined that Eason had at least three prior convictions for a violent felony or serious drug offense, or both, and therefore was subject to sentencing as an armed career criminal. At an offense level of 34, and a criminal history category VI, Eason's advisory Guidelines range was 262-327 months. The district court imposed a sentence of 300 months. Eason timely appealed.

## II. Discussion

**1. Dash Camera Video**

Eason's first argument is that the district court erred in excluding evidence of a dash camera video from Officer Kuykendall's squad car. At trial, Sergeant Kuykendall testified on cross examination that his patrol car did not have a dash camera. At that point, Eason's counsel requested a bench conference, and informed the court that, through a Freedom of Information Act (FOIA) request, she had obtained a dash camera video for June 16, 2012, which showed "an officer who looks like [Kuykendall]" in the footage. [1] Defense counsel told the court the video was "not relevant to this case in that it's not about this case, but it would show that he does have a dash camera." The government did not object to the defense questioning Kuykendall about the video, but expressed concern about the video being played for the jury. The court concluded that the defense had "a good faith basis to impeach" Kuykendall with the video and allowed Eason to question him about it. At that point, the court did not permit the video to be played for the jury, but said "we'll just call him back tomorrow." When cross examination resumed, Kuykendall testified that he did not "remember exactly" whether he had a dash camera in his patrol car on the night of Eason's arrest. After his testimony concluded, Officer Kuykendall was told he was subject to recall as a witness.

[1]     When Officer Kuykendall and his colleagues first encountered Eason, they searched Eason and the area around him. They found a .45-caliber pistol and two expended .45-caliber rounds. The dash camera video is from later that night, when Officer Kuykendall returned to the scene after the arrest to search for additional evidence, and found none. It appears that at the time of Kuykendall's initial cross examination, counsel did not know what exactly was depicted on the video.

Two days later, the parties revisited the issue of the dash camera video with the court outside the presence of the jury. Apparently, in the interim, counsel for Eason watched the video in full for the first time. This time, she informed the court that she had "discovered that there was evidence directly relevant to the investigation in this case" on the video, because it showed Officer Kuykendall returning to the scene of Eason's arrest. The

government objected to use of the video because the defense had not provided it to the government prior to trial, which the government regarded as a violation of its request for reciprocal discovery under Federal Rule of Criminal Procedure 16. The court sustained the objection, reiterating that the defense could use the video as impeachment through questioning, but could not play it in front of the jury.

On appeal, Eason argues that the district court erred in excluding the dash camera video at two separate times: when the district court prevented the defense from showing the video to the jury (1) during the initial re-cross examination of Kuykendall, and (2) when the defense attempted to re-call Kuykendall as a witness to impeach him with the video. We analyze each instance in turn, reviewing evidentiary rulings for abuse of discretion. See United States v. Medearis, 380 F.3d 1049, 1056 (8th Cir. 2004).

**\*3** As to the initial re-cross examination, the government argues that Eason did not offer the video, and thus the district court could not have erred in excluding it. [2] We will assume for the sake of analysis that Eason made a request to show the video, but question whether the district court in fact denied the request. Instead of an outright denial, the court's ruling appears to have been a suggestion to address the issue the following day. Nevertheless, we will further assume the district court's response of "[n]ot in front of the jury" was a denial of the request. However, Eason's counsel stated the video was "not relevant to this case in that it's not about this case." The district court repeated that the video had "nothing to do with this case," to which the defense responded "[c]orrect." "[A] witness may not be impeached on a collateral matter by the use of extrinsic evidence." United States v. Grooms, 978 F.2d 425, 428 (8th Cir. 1992). Eason conceded that the video as presented to the court was not a "matter material to the substantive issues of the case," id. at 429 (quoting Cwach v. United States, 212 F.2d 520, 530 (8th Cir. 1954)), and thus it "could not be shown in evidence for any purpose independent of the contradiction." United States v. Roulette, 75 F.3d 418, 423 (8th Cir. 1996). The video was "therefore inadmissible" based on the information given by defense counsel at the time. Id. The district court allowed Eason to question Officer Kuykendall about the video, agreeing with Eason that this line of impeachment was acceptable. And Eason followed up by questioning

Officer Kuykendall about whether he had a "video unit" in his squad car. The district court did not abuse its discretion in not permitting the defense to play the video during initial re-cross examination.

2    The government did not argue that any violation of Fed. R. Crim. P. 16 required exclusion of the video on initial re-cross examination.

Eason also asserts error when the district court denied his later request to show the video to Officer Kuykendall for the purpose of impeaching him. The government objected, this time asserting a Rule 16 discovery violation. The reciprocal discovery rule, Rule 16(b)(1)(A), states that if the government complies with a defendant's requested disclosures, the defense must provide the government, upon request, similar items "within the defendant's possession, custody, or control," if "the defendant intends to use the item in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A)'s requirements for disclosure of evidence, however, do not apply to impeachment evidence. Medearis, 380 F.3d at 1057. Thus, the fact that defense counsel did not turn over the video to the government prior to trial is not grounds to prohibit the defense from using the video for impeachment purposes. [3] But when reviewing an evidentiary ruling, we will reverse "only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." United States v. Picardi, 739 F.3d 1118, 1124 (8th Cir. 2014) (quoting United States v. Summage, 575 F.3d 864, 877 (8th Cir. 2009)).

3    Typically, the defense calling a witness would be part of its case-in-chief and therefore within the parameters of Rule 16. Here, however, the district court specifically suggested, instead of pursuing an additional line of questioning during the initial cross examination, that Officer Kuykendall be called back as a witness. We therefore view Eason's subsequent attempt to introduce the video as the attempted introduction of evidence "for impeachment purposes ... not excludable under Rule 16(b)(1)(A)," and not as evidence in his case-in-chief. Medearis, 380 F.3d at 1057.

In this case, Eason has failed to show how not playing the video affected his substantial rights or had more than a slight influence on the verdict. See United States v. Yarrington, 634 F.3d 440, 447 (8th Cir. 2011). While the district court prevented Eason from showing the video during additional cross examination, the court expressly permitted the defense to "call him back, and ask him if he didn't go back and look [at the scene of arrest]" as well as about whether he was "searching the ground with a flashlight with his headlights on with a dash cam that he testified he didn't have or he wasn't sure [he had]." The court placed no limitations – other than playing the video – on Eason's ability to take Kuykendall through every step of what the video showed or to impeach Kuykendall based on his memory of the evening. [4] Eason argues that the video was important because it would have "assist[ed] the jury about the conditions at the alleged crime scene on the night of [Eason's arrest]," but he points to no particular condition or aspect of the crime scene that the jury needed to see. While we do not dispute Eason's assertion that Kuykendall's credibility was important to the defense, Eason fails to explain how Kuykendall would have been further impeached by showing the video. Our conclusion – that Eason has not shown a sufficient effect on his rights or on the verdict – is further supported by the fact that, after the video was excluded, Eason declined to conduct any additional cross examination of Kuykendall at all. [5]

4    The court also indicated it would have allowed Eason to show Officer Kuykendall the tape outside of the presence of the jury to prepare him for the cross examination. The record shows no indication that Eason took advantage of this opportunity.

5    Eason also argues that the government's failure to provide a copy of the dash camera video was a violation of Brady. The government commits a Brady violation when it suppresses evidence that is favorable to a defendant and is material as to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). But Eason made only a passing reference to Brady before the district court, and failed to seek a ruling from the district court on this issue. Regardless of whether Brady applies to the circumstances presented here, Eason does not explain how showing the video was "material as to guilt." See Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (per curiam) (Holding evidence is material to guilt if there is a reasonable probability that the result of the proceeding would have been different "had the evidence been disclosed to the defense.").

**2. Defense Photographs**

*4 Eason attempted to introduce photographs taken by a defense investigator, depicting the area where the police arrested Eason and found the .45-caliber pistol on June

16, 2012. The government objected that the defense had violated its reciprocal discovery obligation, and the court excluded the photographs from evidence. Eason alleges that the district court improperly prohibited him from introducing the photographs because the jury requested to view the scene of the crime, indicating that they wanted more information about it that the photographs could have provided.

The photographs were evidence Eason attempted to introduce during his case-in-chief and were therefore subject to the requirements of Rule 16(b)(1)(A). See Medearis, 380 F.3d at 1057. The defense's failure to turn them over to the government was a violation of that rule. Eason argues that even if there was a Rule 16 violation, excluding the photographs completely was too harsh a sanction. But Eason offered no option less severe than exclusion for the district court to consider. Regardless, even if it was error not to permit Eason to introduce these photographs at trial, Eason has failed to establish an effect on his substantial rights or on the verdict. See Picardi, 739 F.3d at 1124 (quoting Summage, 575 F.3d at 877). While the jury may have wanted to see the scene, Eason does not explain how the photos would have significantly aided in their assessment of the evidence or how seeing the scene would have influenced the verdict. Eason points to no controverted issues at trial that the inclusion of the photographs would have helped resolve. Therefore, we cannot conclude that the district court abused its discretion in excluding the photographs.

### 3. Sufficiency of the Evidence

Eason alleges that there was not enough evidence for the jury to find him guilty of being a felon in possession of ammunition as charged in Count 2. We review the sufficiency of the evidence to support a conviction de novo, viewing the evidence in the light most favorable to the jury's verdict and accepting all reasonable inferences in support of the verdict. United States v. Armstrong, 782 F.3d 1028, 1035 (8th Cir. 2015). "[W]e will reverse only if no reasonable jury could have found [Eason] guilty beyond a reasonable doubt." Id. (first alteration in original) (quoting United States v. McCraney, 612 F.3d 1057, 1063 (8th Cir. 2010)).

Eason argues the government failed to prove he knowingly possessed ammunition on April 9, 2013. He asserts that the main evidence on this issue was the testimony of Hiawatha Williams, who admitted he could

not conclusively say Eason possessed the ammunition. Williams testified, "a shot was fired from I don't know exactly if it came from Mr. Eason. My belief it was." However, the evidence also included Williams's testimony that he saw Eason leave Williams's home with "something that looked like a gun," and that Eason had a "big pistol." The jury also heard evidence about the spent bullet casings found at the Williams residence, the 911 call from Erica Davis telling officers Eason had a gun, and the testimony of an officer who responded to the scene and said Davis told him Eason had a gun. The jury was permitted to consider all of the evidence and give it the weight it saw fit. Viewing the evidence in the light most favorable to the jury's verdict, we cannot find that "no reasonable jury" could have concluded that Eason knowingly possessed ammunition as charged in Count 2. Armstrong, 782 F.3d at 1035.

### 4. Armed Career Criminal Enhancement

Eason asserts the district court erred by sentencing him as an armed career criminal under 18 U.S.C. § 924(e)(1) ("In the case of a person who violates section 922(g) of this title and has three previous convictions for a violent felony or a serious drug offense, or both ... such person ... shall be imprisoned not less than fifteen years ...."). Eason has a prior 2006 conviction for delivery of cocaine, which he does not contest qualifies as a serious drug offense for purposes of the ACCA. We now must determine whether he has two additional qualifying prior convictions such that he was properly sentenced pursuant to the ACCA. "We review de novo whether a prior conviction is a predicate offense under the ACCA." United States v. Shockley, 816 F.3d 1058, 1062 (8th Cir. 2016) (quoting United States v. Humphrey, 759 F.3d 909, 911 (8th Cir. 2014)).

**\*5** At sentencing, Eason made a general objection to use of the residual clause of the ACCA, arguing it was unconstitutionally vague and could not be applied to determine whether his prior convictions qualified for purposes of the enhancement. Eason did not specifically object to any particular conviction or make any additional argument to the district court. The district court overruled the objection, without ruling on whether the two additional convictions qualified under the residual clause, the force clause, or both. [6]

6   The government sought and obtained a concession from Eason at sentencing that "there is no objection that Mr. Eason falls with[in] the residual clause," and did not introduce any evidence or argument to support a finding that any of Eason's prior convictions qualified under the "force clause."

While this appeal was pending, the Supreme Court held that the residual clause of the ACCA is unconstitutionally vague. See Johnson v. United States, 135 S. Ct. 2551, 2557 (2015). Because Eason's prior convictions can no longer qualify as predicate offenses under the residual clause, the only remaining question is whether any of his prior felonies can qualify as predicate offenses under the ACCA's force clause. The force clause of the ACCA applies to felony offenses that include "as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). "Physical force 'means *violent* force—that is, force capable of causing physical pain or injury to another person.' " United States v. Schaffer, 818 F.3d 796, 798 (8th Cir. 2016) (quoting Johnson v. United States, 559 U.S. 133, 140 (2010)).

In determining whether a prior conviction qualifies as a predicate offense for purposes of the ACCA sentencing enhancement, we first apply the categorical approach, looking "only to the fact of conviction and the statutory definition of the prior offense." Shockley, 816 F.3d at 1063 (quoting Taylor v. United States, 495 U.S. 575, 602 (1990)). One of Eason's prior convictions was for robbery under Ark. Code Ann. § 5-12-102. The Arkansas robbery statute, § 5-12-102, states "[a] person commits robbery if, with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately after committing a felony or misdemeanor theft, the person employs or threatens to immediately employ physical force upon another person." Id. Physical force under Arkansas law is defined as "any ... [b]odily impact, restraint, or confinement; or [t]hreat of any bodily impact, restraint, or confinement." Ark. Code Ann. § 5-12-101. After Johnson, this definition, on its face, falls short of requiring "force capable of causing physical pain or injury to another person."

In United States v. Sawyer, 588 F.3d 548, 556 (8th Cir. 2009), we stated that "[b]y definition, robbery in Arkansas qualifies as a crime of violence under § 4B1.2(a)(1)" of the United States Sentencing Guidelines because the statute states that "the person employs or threatens to immediately employ physical force upon another person." See United States v. Williams, 537 F.3d 969, 971 (8th Cir. 2008) ("[W]e are bound by cases interpreting whether an offense is a crime of violence under the Guidelines as well as cases interpreting whether an offense is a violent felony under the [ACCA]."). Subsequently, the Supreme Court wrote in Johnson v. United States that "in the context of a statutory definition of '*violent* felony,' the phrase 'physical force' means *violent* force – that is, force capable of causing physical pain or injury to another person." 559 U.S. 133, 140 (2010). Because Sawyer was pre-Johnson, we had no occasion to address whether or not the "physical force" required by the Arkansas robbery statute and elucidated by Arkansas's statutory definition of that term was equivalent to the violent force sufficient to qualify as a crime of violence under the force clause after Johnson. "It is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel." United States v. Anderson, 771 F.3d 1064, 1066–67 (8th Cir. 2014) (quoting United States v. Betcher, 534 F.3d 820, 823 (8th Cir. 2008)). "This rule, however, does not apply when the earlier panel decision is cast into doubt by an intervening Supreme Court decision." Id. (citing Williams, 537 F.3d at 975). Johnson "elevated the necessary quantum of force from de [*minimis*] to 'violent,' " United States v. Winston, No. 3:01-cr-00079, 2016 WL 2757451, at *5 (W.D. Va. May 11, 2016), and thereby "casts sufficient doubt on the reasoning" of some pre-Johnson holdings regarding crimes of violence, United States v. Holloway, 630 F.3d 252, 254–55 (1st Cir. 2011). Therefore, Sawyer's "rule that the boilerplate charging language of [robbery] alone establishes a violent felony" may be rightfully reevaluated. Id. While the reasoning of Sawyer "is no longer sound, its conclusion may still be correct if robbery under [Arkansas] law" meets the Johnson standard. Winston, 2016 WL 2757451, at *5. It does not.

**\*6** The Supreme Court of Arkansas has held that the degree of force used was sufficient to support a robbery conviction even where there was no threat of force and no actual injury befell the victim. See Fairchild v. State, 600 S.W.2d 16, 17 (Ark. 1980) ("[J]erking the door from [a victim], cornering [her] in the back hallway and grabbing her dress [lightly] is sufficient restraint and bodily impact to constitute physical force."); see also United States v. Castro-Vazquez, 802 F.3d 28, 37 (1st Cir. 2015) (holding that Puerto Rico's robbery statute did not require violent force where "violence" was defined to include only the slightest use of force). But see Banks v. State, 2009 Ark.

App. 633, at *3 (Ark. Ct. App. 2009) ("[The Arkansas Supreme Court] has stated that the mere snatching of money or goods from the hand of another is not robbery 'unless some injury is done to the person or there be some struggle for possession of the property prior to the actual taking or some force used in order to take it.' " (quoting Parker v. State, 529 S.W.2d 860, 863 (1975))). In sum, we cannot conclude that the degree of physical force required to commit robbery in Arkansas rises to the level of physical force required to establish a crime of violence for ACCA purposes. [7] See Schaffer, 818 F.3d at 798.

[7]   While we have held that force that produces even a minimal degree of bodily injury constitutes violent force, see United States v. Rice, 813 F.3d 704, 706 (8th Cir. 2016), actual bodily injury is not required to establish a robbery under Arkansas law. We have also held, however, that not every unwanted touching constitutes violent force. See, e.g., United States v. Ossana, 638 F.3d 895, 900 (8th Cir. 2011) (holding that the Arizona simple assault statute, Ariz. Rev. Stat. § 13-1203, which could be violated "with any degree of contact by '[k]nowingly touching another person with the intent to ... insult or provoke such person,' " did not qualify as the use of physical force because it was not violent force). Other courts have similarly held that not all unwanted touchings rise to the level of violence required by the force clause. See, e.g., United States v. Gardner, No. 14-4533, 2016 WL 2893881, at *7 (4th Cir. May 18, 2016) (holding that the force required under North Carolina's robbery statute was insufficient to qualify categorically as a crime of violence, and supporting that result with examples of upheld convictions where "a defendant pushed the shoulder of an electronics store clerk, causing her to fall onto shelves while the defendant took possession of a television," and where a defendant "push[ed] the victim's hand off of a carton of cigarettes.")

Eason was also convicted of third degree domestic battery, under Ark. Code Ann. § 5-26-305. Because there are multiple subdivisions of the third degree domestic battery statute and we cannot categorically determine that it is a crime of violence under the force clause, we must use the modified categorical approach to attempt to establish which subdivision of the statute supported Eason's conviction. The only information in the record establishing this conviction comes from Eason's PSR, to which he did not object. The relevant entry "provides a brief description of the underlying facts, based on 'court records.' " Shockley, 816 F.3d at 1063. "Without more information about the source of these offense descriptions, we cannot rely on the factual assertions in [Eason's] PSR." Id. (citing Ossana, 638 F.3d at 903 ("[I]n applying the modified categorical approach, sentencing courts may not look to factual assertions within federal presentence investigation reports – even if the defendant failed to object to the reports – where the source of the information in the reports might have been from a non-judicial source.")). Without conclusive evidence establishing which subsection of the statute Eason was convicted of violating, we may not conclude this prior conviction was a violent felony under the force clause. Id.

### III. Conclusion

Because Eason did not have at least three predicate offenses [8] for purposes of 18 U.S.C. § 924(e), we vacate his sentence and remand to the district court for resentencing. We affirm the judgment in all other respects.

[8]   Eason was also convicted of first degree battery under Ark. Code Ann. § 5-13-201. Because the government has established only one other predicate offense, we need not determine whether this conviction qualifies under the force clause.

**All Citations**

--- F.3d ----, 2016 WL 3769477

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.